UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



Grand Jury H-22-1

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:24 CR 107 ( VAB ) SDV |
| v. | VIOLATIONS: |
| KENNETH DENNING, JOSHUA BAKER, and WILLIAM MAYO | 18 U.S.C. § 371 (Conspiracy) |

18 U.S.C. § 371 (Conspiracy)

18 U.S.C. § 1952 (Travel Act Violation)

8 U.S.C. § 1324a
(Illegal Hiring of Aliens)

26 U.S.C. § 7203
(Failure to File Tax Return)

26 U.S.C. § 7206 (Filing False Tax Return)

18 U.S.C. § 1956(h) (Conspiracy to Commit
Money Laundering)

18 U.S.C. § 1957 (Monetary Transaction in
Property Derived from Unlawful Activity)

18 U.S.C. § 1343 (Wire Fraud)

18 U.S.C. § 2 (Aiding and Abetting)

<u>INDICTMENT</u>

The Grand Jury charges:

<u>Background</u>

At all relevant times to this Indictment:

1.     Defendant KENNETH DENNING was the owner of the Electric Blue Café ("the Electric Blue" or "the club"), a strip club located in Tolland, Connecticut. The Electric Blue was owned by Denning Enterprises, a holding company nominally owned by DENNING's wife, but controlled by DENNING.

1

2.      Defendant Joshua BAKER worked at the Electric Blue and served as the manager and bookkeeper for the club.

3.      Defendant William MAYO worked at the Electric Blue and served as a bouncer and was responsible for hiring dancers to work at the club.

### Background on the Electric Blue

4.      The defendants and their coconspirators attracted customers to the Electric Blue by advertising and featuring women dancing nude and semi-nude on stages and in private and semi-private rooms. The Electric Blue advertised itself on social media and elsewhere as a gentlemen's club that employed numerous dancers and held promotional events and contests.

5.      On some occasions, but not all, customers would be required to pay a cover charge, typically $5 but sometimes more, at the door to enter the Electric Blue. The cover charge was always paid in cash.

6.      The Electric Blue had multiple small, private rooms inside. These rooms, called "VIP rooms" or "Champagne rooms," were typically furnished with a small couch and were separate from the rest of the club. To enter one of the VIP rooms with a dancer, a customer had to pay a fee to an employee of the club, usually but not always paid in cash, and then negotiate an additional fee with the dancer directly for their time in the VIP room. These additional fees often included payments for commercial sex acts with the dancers.

7.      The Electric Blue also had a "lap dance room," which was a room with semi-private stalls where dancers and customers could go for private dances. To enter the lap dance room, a customer had to pay a cash fee to an employee of the club, and then negotiate a fee for the private dance directly with the dancer. These additional fees often included payments for commercial sex acts with the dancers.

8.      Dancers were encouraged by employees of the Electric Blue, including the defendants, to solicit customers to engage in commercial sex transactions in the private and semi-private rooms.

9.      The defendants ordered, placed, and operated automated teller machines ("ATMs") in the Electric Blue. Defendant DENNING profited from the use of the ATMs by customers of the Electric Blue. The ATMs were facilities operating in interstate commerce.

The Economic Injury Disaster Loan Program

10.     The United States Small Business Administration ("SBA") is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

11.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

12.     The Economic Injury Disaster Loan ("EIDL") program was a SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

13.    The CARES Act also authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL loan. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

14.    In order to obtain an EIDL loan and/or advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was that preceding January 31, 2020. On the application for the loan, the applicant was asked a number of questions, one of which was certifying that "Applicant does not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." The applicant was required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

15.    EIDL applications were submitted directly to the SBA. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL loan or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

COUNT ONE
(Conspiracy to Use Interstate Commerce to Promote Prostitution)

16.    The allegations set forth in Paragraphs 1 through 9 are incorporated by reference.

17.    Beginning in or around January 2020 and continuing through at least March 2023, in the District of Connecticut and elsewhere, defendants KENNETH DENNING, JOSHUA BAKER, and WILLIAM MAYO did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit an offense against the United States, namely, the following object of the conspiracy:

Object of the Conspiracy

18.    The defendants and their coconspirators agreed to use facilities in interstate commerce, including but not limited to automatic teller machines ("ATMs"), the processing of credit card payments, and social media accounts operated on behalf of the Electric Blue, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, prostitution offenses in violation of the laws of Connecticut, including but not limited to Connecticut General Statutes Sections 53a-82, 53a-87, and 53a-88, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful conduct, in violation of Title 18, United States Code, Section 1952(a)(3) and 1952(b)(i)(1).

Manner and Means of the Conspiracy

19.    Defendants KENNETH DENNING, JOSHUA BAKER, and WILLIAM MAYO and their coconspirators carried out their conspiracy using the following manner and means, among others:

a.  The defendants and their coconspirators hired dancers to work at the Electric Blue. They then allowed nude dancers, commonly referred to as strippers, to perform at the Electric Blue. Despite Connecticut laws prohibiting fully nude dancers at strip clubs, the defendants and their coconspirators allowed and encouraged dancers to be fully nude.

b.  The defendants and their coconspirators typically, but not always, required each dancer to pay a "house fee" to perform. The amount for house fees varied but could be as much as $50 per dancer per shift. This payment was almost always paid in cash and was collected by the defendants and their coconspirators.

c.  The dancers would perform dances for customers, often referred to as lap dances, in the semi-private "lap dance room." The defendants and their coconspirators maintained the lap dance room for this purpose. To enter the lap dance room with a dancer, a customer would pay a cash fee, typically $20, to an employee of the bar. Defendants and their coconspirators collected the $20 entrance fee to the lap dance room. The customer then paid the dancer a separate fee for the lap dance.

d.  Customers regularly paid dancers for commercial sex acts in the lap dance room. The sex acts would occur in semi-private booths. The defendants and their coconspirators understood and intended that a lap dance often involved dancers engaging in sex acts with the customers. The lap dance room was visible to the defendants and other employees of the club, who could see in the room or inspect what was going on inside. The defendants could also view the lap dance room through security cameras on screens in the back office of the Electric Blue.

e.  In addition, the dancers would perform dances or shows for customers in private rooms in the club, often referred to as the "VIP room" or the "Champagne room." These rooms were separated from the rest of the club, giving the dancers and their customers privacy from the rest of the patrons. To enter a private room with a dancer, a customer had to pay a fee to the bar, typically $100-$150, often but not always paid for in cash.

f.  Customers would regularly pay dancers for commercial sex acts in the private rooms. The customers would pay the dancers directly, almost always in cash, for the commercial sex act.

g.  Many customers at the Electric Blue obtained some or all of the cash used to pay for entrance fees to the semi-private and private rooms and for commercial sex acts from dancers from ATMs on the premises. The defendants and their coconspirators knew and intended that customers would regularly use cash from the ATMs to pay for commercial sex acts.

h.  The $20 fee to enter the lap dance room and the $100-$150 fee to enter the private rooms, typically paid in cash, went to "the house," meaning these funds went to the defendants and their coconspirators. The dancers negotiated the fees paid for the lap dances or private shows and retained those fees, which were almost always paid in cash. In other words, the dancers performed sexual acts on their customers in return for the customers having paid "the house" a fee, typically either $20 or $100-$150 depending on the level of privacy desired, along with paying the dancer a separate fee, sometimes hundreds of dollars or more, often with cash from the ATMs.

    i.  In addition, dancers sometimes travelled to locations away from the Electric Blue with customers to engage in commercial sex acts. Employees of the club, who worked for DENNING and were managed by BAKER, often drove dancers to the locations to engage in commercial sex acts, which were often paid for in cash.

    j.  Defendants and their coconspirators sent text messages in interstate commerce to communicate with dancers, customers, and other individuals about commercial sex acts and about club business.

    k.  To conceal the conspiracy and to conceal their knowing facilitation, promotion, and management of the commercial sex acts at the Electric Blue, the defendants and their coconspirators required the dancers to sign a contract before beginning employment at the club. The contract states, among other things, that dancers "must be clothed at all times;" "cannot be touched by any other person on the premises on the breasts, buttocks, anus, or genitals;" and "cannot perform Sexual Acts of any kind on the premises, regardless of whether the dancer has chosen to consensually perform such acts even at the dancer's own free will."

Overt Acts in Furtherance of the Conspiracy

20.    Defendants KENNETH DENNING, JOSHUA BAKER, and WILLIAM MAYO and their coconspirators committed, and caused to be committed, the following overt acts, among others, in the District of Connecticut and elsewhere, in furtherance of the conspiracy and to effect the object of the conspiracy:

    a.  The defendants ordered the ATMs that were placed at the Electric Blue and would request maintenance of the machines when they stopped operating so that

8

customers could use them to obtain cash to pay for commercial sex acts, each such order for maintenance being a separate overt act.

b.  The defendants and their coconspirators allowed dancers to use the businesses' semi-private and private rooms to perform commercial sex acts on customers, each allowance of such use being a separate overt act.

c.  The defendants and their coconspirators required each customer involved in a semi-private or private show during which a dancer would perform one or more commercial sex acts on the customer to pay a fee to "the house," the amount of which depended on the level of privacy desired by the customer, as a fee for use of the semi-private or private room, the collection of each fee to "the house" being a separate overt act.

d.  The defendants and their coconspirators provided the dancers at the club with condoms for use during commercial sex acts at the club, each provision of condoms being a separate overt act.

e.  The defendants and their coconspirators required the dancers to sign a contract before beginning work at the Electric Blue, each such signing being a separate overt act.

f.  A coconspirator regularly posted on social media accounts for the club, including a Facebook account in the name "Electric Blue Café" advertising and promoting events with dancers to attract customers, each social media post being a separate overt act.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
(Illegal Hiring of Aliens)

21.     The allegations set forth in Paragraphs 1 through 9 are incorporated by reference.

22.     Beginning in or around 2020 and continuing through at least March 2023, in the District of Connecticut and elsewhere, defendants KENNETH DENNING, JOSHUA BAKER, and WILLIAM MAYO engaged in, and aided and abetted in, a practice and pattern of hiring for employment in the United States certain aliens whose identities are known to the Grand Jury, knowing that said aliens were unauthorized aliens (as defined in Title 8, United States Code, Section 1324a(h)(3)), with respect to such employment.

In violation of Title 8, United States Code, Sections 1324a(a)(1)(A) and 1324a(f)(1), and Title 18, United States Code, Section 2.

## COUNT THREE
(Conspiracy to Defraud the United States)

23.     The allegations set forth in Paragraphs 1-9 and 19-20 are incorporated by reference.

24.     The Internal Revenue Service ("IRS") is an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting taxes owed to the United States Treasury.

### Object of the Conspiracy

25.     Beginning on or about January 1, 2020 and continuing up to and including May 14, 2024, in the District of Connecticut and elsewhere, defendants KENNETH DENNING and JOSHUA BAKER, and others known and unknown to the Grand Jury, unlawfully and knowingly combined, conspired, confederated, and agreed together to defraud the United States by deceitful and dishonest means by impeding, impairing, obstructing, and defeating the lawful government

functions of the IRS, an agency of the United States, in the ascertainment, computation, assessment, and collection of revenue, that is, federal individual income taxes and corporate taxes.

Manner and Means of the Conspiracy

26.    Defendants KENNETH DENNING and JOSHUA BAKER, and others known and unknown to the Grand Jury, carried out their conspiracy using the following manner and means, among others:

a.  The defendants and their coconspirators established a policy to separate income earned at the Electric Blue through legitimate means, often derived from a customer paying for food or beverages with a credit or debit card, from income earned through illegal means such as prostitution, typically paid for in cash.

b.  Defendant KENNETH DENNING and his wife opened a corporate bank account in 2003 at People's United Bank, now referred to as M&T Bank, (account ending 6848), which was opened in the name "Denning Enterprises." Each time a customer used a credit or debit card for a purchase at the Electric Blue, typically alcohol, that income would go into the corporate bank account. DENNING closed account ending 6848 in or around January 2021. After closing account ending 6848, DENNING and his coconspirators opened and closed multiple other corporate bank accounts at different banks.

c.  The defendants and their coconspirators referred to this money as "bar money" or "club money."

d.  The defendants and their coconspirators reported all income that entered into the corporate bank accounts to their tax return preparer, who then used that information to pay taxes on that income to the IRS and relevant Connecticut state agencies.

e.  The defendants and their coconspirators collected the cash taken in by the club, often through the payment by a customer of a "house fee" to enter a semi-private or private room with a dancer, a cover charge paid at the door, or a fee paid by dancers in order to dance at the club. This cash was collected, put in envelopes noting the source of the cash, and then put in a safe in the office of the Electric Blue that only DENNING could access.

f.  The defendants and their coconspirators referred to this money as "Kenny's money."

g.  The defendants and their coconspirators used or caused the use of the cash receipts of the business to make cash payments associated with the daily operation of the business, including paying the mortgage on the property and paying employees of the club, in part to prevent the IRS from calculating the correct amount of gross receipts for the business and the payroll taxes owed by the business.

h.  The defendants and their coconspirators each year gave a tax return preparer false information about receipts and payroll expenses of the Electric Blue, concealed from the tax return preparer information about the cash receipts from private shows and dancer fees, and provided false information about the number and identities of certain employees of the club, intending that the tax return preparer would use this false or misleading information to prepare corporate tax returns that would underreport the amount of gross and taxable income of, and tax due from, the business and the coconspirators.

i.  The defendants and their coconspirators regularly used unreported cash receipts from the Electric Blue to pay personal expenses.

j.  Defendant KENNETH DENNING regularly used unreported cash receipts to gamble large sums of money at casinos in Connecticut and elsewhere.

k.  The defendants and their coconspirators caused as much as approximately $5,726,918.73 in material taxable business receipts not to be reported to the IRS, causing a total income tax underpayment of approximately $2,092,864.

<u>Overt Acts in Furtherance of the Conspiracy</u>

27.  In furtherance of said conspiracy and to effect the objects thereof, between on or about January 1, 2020 and continuing up to and including May 14, 2024, defendants KENNETH DENNING and JOSHUA BAKER, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the District of Connecticut and elsewhere:

a.  For tax years 2020, 2021, and 2022, the defendants and their coconspirators gave a paid tax return preparer false information about the receipts of the business, each such occurrence being a separate overt act.

b.  For tax years 2020, 2021, and 2022, the defendants and their coconspirators filed federal corporate tax returns that substantially underreported the receipts of the business, the filing of each such false tax return being a separate overt act.

All in violation of Title 18, United States Code, Section 371.

COUNT FOUR
(Failure to File a Federal Income Tax Return)

28.      The allegations set forth in Paragraphs 1-9, 19-20, and 26-27 are incorporated by reference.

29.      During the calendar year 2021, defendant KENNETH DENNING, a resident of Holland, Massachusetts, had and received gross income in excess of $12,550, specifically as much as $156,000 in documented wages from the Electric Blue and as much as approximately $2,626,748 in diverted cash from the Electric Blue. By reason of such gross income, he was required by law, following the close of calendar year 2021, and on or before October 15, 2022, to make an income tax return to the Internal Revenue Service, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Knowing and believing all of the foregoing, he did willfully fail, on or about October 15, 2022, in the District of Connecticut and elsewhere, to make an income tax return.

In violation of Title 26, United States Code, Section 7203.

COUNT FIVE
(Aiding and Assisting in the Preparation and Presentation of a False and Fraudulent Tax Return)

30.      The allegations set forth in Paragraphs 1-9, 19-20, and 26-27 are incorporated by reference.

31.      On or about October 21, 2021, in the District of Connecticut and elsewhere, defendant KENNETH DENNING, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of a false U.S. Individual Income Tax Return, Form 1040, for the calendar year 2020. The tax return was false and fraudulent as to material matters, in that the said return, among other false items, substantially understated DENNING's income. DENNING reported taxable income of $162,796 and the amount of tax due

of $32,093, whereas, as DENNING then and there well knew and believed, he did not report as much as approximately $571,891.39 in income derived from the Electric Blue.

In violation of Title 26, United States Code, Section 7206(2).

## COUNTS SIX – EIGHT
(Aiding and Assisting in the Preparation and Presentation of False and Fraudulent Tax Returns)

32.     The allegations set forth in Paragraphs 1-9, 19-20, and 26-27 are incorporated by reference.

33.     On or about the dates set forth below, in the District of Connecticut and elsewhere, defendant KENNETH DENNING did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Corporation Income Tax Returns, Forms 1120, for the taxpayer and calendar years set forth below, which were false and fraudulent as to a material matter. The tax returns omitted material cash receipts received by the Electric Blue primarily due to the provision of commercial sex acts performed by dancers at the club, whereas, as DENNING then and there well knew and believed, the business had a responsibility to report all income generated, including cash receipts.

| Count | Approximate Filing Date | Taxpayer | Year | False Item(s) |
|-------|------------------------|----------|------|---------------|
| 6 | 03-14-2022 | Denning Enterprises | 2020 | Underreporting line 1a "Gross receipts or sales" by as much as approximately $571,891 |
| 7 | 05-09-2022 | Denning Enterprises | 2021 | Underreporting line 1a "Gross receipts or sales" by as much as approximately $2,626,747 |
| 8 | 10-13-2023 | Denning Enterprises | 2022 | Underreporting line 1a "Gross receipts or sales" by as much as approximately $2,528,279 |

All in violation of Title 26, United States Code, Section 7206(2).

COUNT NINE
(Conspiracy to Commit Money Laundering)

34.     The allegations set forth in Paragraphs 1-9, 19-20, and 26-27 are incorporated by reference.

35.     Beginning in or around 2020 and continuing through and until in or about March 2023, in the District of Connecticut and elsewhere, defendants KENNETH DENNING and JOSHUA BAKER, did knowingly combine, conspire, confederate, and agree, along with others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Section 1956, that is, to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, involving the proceeds of specified unlawful activity, that is, violations of the Travel Act, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of the specified unlawful activity, and knowing that such transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

36.     The manner and means of the money laundering conspiracy included the following acts, among others, to promote the carrying on of the prostitution scheme and to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the prostitution scheme.

37.     DENNING employed BAKER at the Electric Blue as a manager and bookkeeper for the club. As part of his employment, and at DENNING's direction, BAKER compiled a monthly spreadsheet showing, among other things, the Electric Blue's purported income. BAKER included on this spreadsheet income generated from food and alcohol sales and other sources of

income from the club, but purposefully omitted cash generated from private dances and commercial sex acts by dancers at the club. BAKER or another Electric Blue employee would send the spreadsheets to the Electric Blue's tax return preparer, who would report to the relevant authorities and prepare taxes on only the reported income. The income generated from the commission of commercial sex acts was not reported to the club's tax return preparer, but instead would be put in envelopes that were placed in a safe that only DENNNING could access. These funds were referred to by BAKER and other Electric Blue employees as "Kenny's money."

38.     In addition, DENNING directed BAKER to use cash derived in whole or in part from income generated by commercial sex acts to promote the carrying on of the club so that more commercial sex acts could occur. For example:

      a.   On or about February 6, 2020, BAKER took at least $600 in cash from the club generated in whole or in part by commercial sex acts at DENNING's behest and used that cash to pay the club's phone/internet bill with Comcast. The $600 was not reported to the club's accountant and no taxes were paid on that income.

      b.   On or about January 21, 2021, BAKER took $3,900 in cash from the club generated in whole or in part by commercial sex acts at DENNING's behest and used that cash to purchase a cashier's check at People's United Bank for $4,000, which he then used to pay the mortgage for the Electric Blue. The $3,900 in income was not reported to the club's accountant and no taxes were paid on that income.

39.     DENNING also directed BAKER to use or attempt to use cash derived in whole or in part from commercial sex acts to conceal and disguise the nature, location, source, and control of the proceeds of specified unlawful activity. For example:

a. On or about February 26, 2020, DENNING instructed BAKER to take $5,000 in cash from the club, which BAKER knew was derived in whole or in part from the commission of commercial sex acts, and deposit it into DENNING's personal bank account, which BAKER did.

b. On or about March 14, 2023, DENNING instructed BAKER to take $5,000 in cash from the club, which BAKER knew was derived in whole or in part from the commission of commercial sex acts and provide it to DENNING's family member so that the money could be used to pay for home renovations on DENNING's home in Massachusetts, which BAKER intended to do.

All in violation of Title 18, United States Code, Sections 1956(h), 1956(a)(1)(A)(i), and 1956(a)(1)(B)(i).

## COUNT TEN
(Monetary Transaction in Property Derived from Unlawful Activity)

40.     The allegations set forth in Paragraphs 1-9, 19-20, and 26-27 are incorporated by reference.

41.     On or about February 23, 2023, in the District of Connecticut and elsewhere, defendant KENNETH DENNING did knowingly engage and attempt to engage in a monetary transaction in and affecting interstate commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000 that was derived from a specified unlawful activity, that is, use of an interstate facility to promote or facilitate prostitution offenses, in violation of Title 18, United States Code, Section 1952(a)(3), as set forth above in Count One, specifically, DENNING deposited approximately $21,700 in cash derived in whole or in part from prostitution at the Mohegan Sun Casino in Uncasville, Connecticut, for purposes of gambling.

All in violation of Title 18, United States Code, Section 1957.

18

COUNT ELEVEN
(Wire Fraud)

42.     The allegations set forth in Paragraphs 1-15 are incorporated by reference.

The Scheme and Artifice to Defraud

43.     Beginning at least as early as April 2020, and continuing through in or around July 2020, in the District of Connecticut and elsewhere, defendant KENNETH DENNING, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, that is, DENNING knowingly provided materially false information to the SBA in order to obtain an EIDL for his business, the Electric Blue, a strip club in Tolland, Connecticut, when, in fact, DENNING knew that he was not eligible to receive an EIDL for such a business.

Manner and Means

44.     It was part of the scheme and artifice that, on or about July 8, 2020, DENNING caused to be submitted an application (in connection with SBA Loan # 3972108103) to the SBA for an EIDL for "Denning Enterprises llc" with the trade name "Electric Blue," seeking a loan amount of $150,000, which contained material misrepresentations, including:

> a.  That the business did "not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature," when in fact it was operating as a strip club and brothel where performances of a prurient sexual nature were performed regularly.
>
> b.  Describing the "Business Activity" as "Eating & Drinking Places" when in fact it was primarily a strip club and brothel.

45.     It was further part of the scheme and artifice that, on or about July 23, 2020, DENNING caused the SBA to have approximately $149,900 paid to account ending 6848 for the benefit of the Electric Blue.

### Execution of the Scheme and Artifice

46.     For the purpose of executing the above-described scheme and artifice, on or about July 8, 2020, in the District of Connecticut and elsewhere, defendant KENNETH DENNING transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, that is, DENNING electronically signed and submitted, and caused to be signed and submitted, A Loan Authorization and Agreement in connection with SBA Loan # 3972108103 for a loan under the EIDL program for the Electric Blue, causing the SBA to wire $149,900 to account ending 6848 on or about July 23, 2020.

All in violation of Title 18, United States Code, Section 1343.

### COUNT TWELVE
(Monetary Transaction in Property Derived from Unlawful Activity)

47.     The allegations set forth in Paragraphs 1-15, 19-20, and 26-27 are incorporated by reference.

48.     On or about July 23, 2020, in the District of Connecticut and elsewhere, defendant KENNETH DENNING did knowingly engage and attempt to engage in, and aid and abet in the same, a monetary transaction in and affecting interstate commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000 that was derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, as set forth above in Count Thirteen, specifically, DENNING caused the transfer of approximately $20,000 in fraudulently obtained EIDL funds occasioned by a check from the

Electric Blue's business bank account at M&T Bank ending 6848 to DENNING's personal bank account at M&T bank ending 9398.

All in violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATION

49.     Upon conviction of the offense alleged in Count Nine, defendants KENNETH DENNING and JOSHUA BAKER shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all right, title, and interest in any property, real or personal, involved in such offense, or any property traceable to such property, obtained directly or indirectly, as a result of violations of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), including but not limited to:

   a.   Approximately $39,000 in United States currency seized on or about March 16, 2023 from the Electric Blue in Tolland, Connecticut; and

   b.   a sum of money equal to the total amount of the proceeds obtained as a result of the offenses.

All in accordance with Title 18, United States Code, Section 982(a)(1), and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

A TRUE BILL

_____
FOREPERSON

UNITED STATES OF AMERICA

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

ROSS WEINGARTEN
ASSISTANT U.S. ATTORNEY

ROBERT DEARINGTON
ASSISTANT U.S. ATTORNEY

22