MAY 19 2026 AM11:46
FILED-USDC-CT-NEW_HAVEN

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*
*157 Church Street, 25th Floor*
*New Haven, Connecticut 06510*

*(203)821-3700*
*Fax (203) 773-5376*
*www.justice.gov/usao/ct*

May 19, 2026

Martin J. Minnella, Esq.
Minnella & Tramuta
40 Middlebury Road
Middlebury, CT 06762

Re: *United States v. Kenneth Denning, et al.*
Case No. 3:24-cr-00107-VAB

Dear Attorney Minnella:

This letter confirms the plea agreement between your client, Mr. Denning (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") in this criminal matter.

**THE PLEA AND OFFENSE**

In consideration for the benefits offered under this agreement, Mr. Denning agrees to plead guilty to Counts One, Three, Nine, Ten, and Twelve of an indictment charging violations of: 18 U.S.C. § 371, Conspiracy (Counts One and Three); 18 U.S.C. § 1956(h), Money Laundering Conspiracy (Count Nine); and 18 U.S.C. § 1957, Monetary Transaction in Property Derived from Unlawful Activity (Counts Ten and Twelve).

**Count One – Conspiracy to Violate the Travel Act, 18 U.S.C. § 371**

The defendant understands that, to be guilty of this offense, the following essential elements must be satisfied:

1. That two or more persons entered into an agreement to violate 18 U.S.C. § 1952(a), that is, violation of the Travel Act by using a facility of interstate commerce to promote or facilitate prostitution, as described in the Indictment;

2. That the defendants knowingly participated in the conspiracy with the specific intent to commit the offense that was the object of the conspiracy; and

3. That during the course of the conspiracy, one of the members of the conspiracy committed an overt act in furtherance of the objectives of the conspiracy.

**Travel Act Violation, 18 U.S.C. § 1952**

The elements of a violation of the Travel Act in violation of 18 U.S.C. § 1952(a), are as follows:

1. The defendant used or caused someone else to use an interstate facility;

2. The use of an interstate facility was done with the intent to promote, manage, establish, or carry on, or to distribute the proceeds of, an unlawful activity, in this case prostitution; and

3. After this use of an interstate facility, such person performed or attempted to perform an act in furtherance of this same unlawful activity.

**Count Three – Conspiracy to Defraud the United States, 18 U.S.C. § 371**

To establish a *Klein* conspiracy under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt:

1. An agreement by two or more persons to impede, impair, obstruct and defeat the lawful functions of the IRS;

2. Knowing and voluntary participation in the conspiracy; and

3. An overt act committed by at least one of the conspirators in furtherance of the agreement.

**Count Nine – Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h)**

The elements of money laundering conspiracy are as follows:

1. A conspiracy existed between two or more persons to commit money laundering or illegal monetary transactions; and

2. The defendant intentionally became a member of, or a participant in, the conspiracy, with the intent to further the unlawful purpose.

The elements of promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) are as follows:

1. The defendant conducted or attempted to conduct a financial transaction that affected interstate commerce;

2. The defendant conducted the financial transaction with proceeds of specified unlawful activity;

3. At the time of the defendant's financial transaction, the defendant knew the property represented the proceeds of some form of unlawful activity; and

4. The defendant conducted the financial transaction with the intent to promote the carrying on of the specified unlawful activity.

The elements of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) are as follows:

1. The defendant knowingly conducted or attempted to conduct a financial transaction;

2. The defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity;

3. The property involved in the financial transaction involved the proceeds of specified unlawful ~~acidity;~~ activity and

4. The defendant engaged in the financial transaction knowing that the transaction was designed, in whole or in part, to conceal or disguise the nature, the location, the source, or the control of the proceeds of the specified unlawful activity.

**Counts Ten and Twelve – Monetary Transaction in Property Derived from Unlawful Activity, 18 U.S.C. § 1957**

The elements of Engaging in Monetary Transactions in Property Derived from a Specified Unlawful Activity are:

1. The defendant knowingly engaged or attempted to engage in a monetary transaction;

2. The monetary transaction was of a value greater than $10,000;

3. The monetary transaction involved criminally derived property;

4. Criminally derived property was derived from a specified unlawful activity;

5. The defendant knew that the monetary transaction involved criminally derived property; and

6. The transaction took place within the United States.

**THE PENALTIES**

Imprisonment

Counts One and Three
This offense carries a maximum penalty of 5 years of imprisonment.

Count Nine
This offense carries a maximum penalty of 20 years of imprisonment.

Count Ten and Twelve
This offense carries a maximum penalty of 10 years of imprisonment.

Supervised Release

Counts One and Three

The Court may impose a term of supervised release of not more than 3 years to begin after any term of imprisonment. 18 U.S.C. § 3583. The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to two years per revocation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

Count Nine

The Court may impose a term of supervised release of not more than 3 years to begin after any term of imprisonment. 18 U.S.C. § 3583. The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to two years per revocation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

Counts Ten and Twelve

The Court may impose a term of supervised release of not more than three years after any term of imprisonment. 18 U.S.C. § 3583. The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to two years per revocation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

Fine

Counts One and Three

Under 18 U.S.C. § 3571, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense or twice the gross loss resulting from the offense, whichever is greater or (2) $250,000.

The parties agree that the gross loss to the United States Government resulting from the offenses to be $550,000 and twice that figure is $1,100,000.

Count Nine

The maximum fine for the money laundering conspiracy charged in Count Nine is $500,000, or twice the amount involved in the transaction, whichever is greater.

Counts Ten and Twelve

As to Counts Ten and Twelve, under 18 U.S.C. § 3571, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) the fine amount specified in the offense of conviction, namely, twice the amount of the criminally derived property involved in the transaction, pursuant to 18 U.S.C. § 1957(b)(2) or (2) $250,000. The Government currently calculates the amount of the criminally derived property involved in the transaction charged in Count Ten to be $21,700; twice that figure is $43,400. The Government currently calculates the amount of the criminally derived property involved in the transaction charged in Count Twelve to be $20,000; twice that figure is $40,000.

Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction for a total of $~~600~~. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

500 RCD

Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. §§ 3663 and 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of §§ 3663 and 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court. In any case in which the United States is a victim, the district court will ensure that all other victims receive full restitution before the United States receives any restitution. 18 U.S.C. § 3664(i).

Regardless of restitution that may be ordered by the Court noted above, the defendant agrees to make restitution in the amount $700,000 ($550,000 for Count Three owed to the Internal Revenue Service and $150,000 owed to the Small Business Administration). The defendant further agrees that if the Court finds that the economic circumstances of the defendant do not allow for payment of the full amount of restitution by the sentencing date, that he hereby agrees to make all restitution payments the manner of which and the schedule of which to be ordered by the Court pursuant to 18 U.S.C. § 3664(f). Moreover, the defendant agrees that he will make all scheduled restitution payments as set by the sentencing Court. *See* also 18 U.S.C. § 3664 (procedures for issuance and enforcement of order of restitution). The parties further agree that they will request that the Court order the making of all such restitution payments to be included as a special condition of any Court imposed period of supervised release.

The defendant agrees that restitution is $109,738 for the Tax Year 2020; $222,006 for Tax Year 2021; and $218,256 for Tax Year 2022, and that he will sign the IRS forms deemed necessary by the IRS to enable it to make assessment of the agreed-upon criminal restitution, including agreeing to sign IRS Form 8821, "Tax Information Authorization." The defendant further agrees to allow the contents of his IRS criminal file to be given to civil attorneys and support staff of the United States Attorney's Office and the IRS to enable them to investigate any taxes owed by the defendant, including, but not limited to, any civil penalties and interest. With respect to disclosure of the criminal file to the above-listed individuals and entities, the defendant waives any rights the defendant might hold under 26 U.S.C. §§ 6103 and 7213 and Fed. R. Crim. P. 6(e). The defendant further waives any other rights he might have to non-disclosure of tax-related information. The defendant agrees as a special condition of probation or supervised release that he will cooperate with the IRS to pay all outstanding taxes, interest, and penalties. Finally, the defendant agrees that he will sign the Waiver of Restrictions on Assessment and Collection of Deficiency in Tax (Form 870) as calculated in the Revenue Agent's Report (Form 4549A) at or before sentencing, setting forth the defendant's civil tax liability for the years at issue.

If the Court orders the defendant to pay restitution to the IRS for the failure to pay tax, either directly as part of the sentence or as a condition of probation or supervised release, the IRS will use the restitution order as the basis for a civil assessment. 26 U.S.C. § 6201(a)(4). The defendant does not have the right to challenge the amount of this assessment. 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor the defendant's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

Interest, penalties, and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (i) and § 3612(g). The defendant reserves the right to request that the Court waive interest and penalties as permitted by statute, and the Government reserves the right to oppose any such request.

Forfeiture

Pursuant to 18 U.S.C. § 982, 28 U.S.C. § 2461, for violations of 18 U.S.C. § 1956, and 18 U.S.C. § 1957, the defendant agrees to forfeit all interest in the following assets: $45,421.00 in United States Currency seized at the Electric Blue, 62 Merrow Road, Tolland, Connecticut 06084 on March 16, 2023 and $1,047.00 in United States Currency seized at 90 Union Road, Holland, Massachusetts on May 15, 2024.

The defendant acknowledges that the assets listed above represent the proceeds of violations of 18 U.S.C. § 1956 and 18 U.S.C. § 1957. The defendant agrees to take all steps as requested by the United States to pass clear title to all of the above assets to the United States, to

share truthful information with agents and representatives of the United States about any facts and claims concerning the assets, and to testify truthfully in any judicial forfeiture proceeding.

Pursuant to 18 U.S.C. § 982, 28 U.S.C. § 2461, and Fed. R. Crim. Pro 32.2(a), for violations of 18 U.S.C. § 1956, and 18 U.S.C. § 1957, the defendant agrees to forfeit a sum of money in the amount of $1,525,842 in United States Currency, which the defendant acknowledges represents proceeds from violations of the above statutes.

To satisfy the above forfeiture money judgment, the defendant agrees to set up a payment plan. Within 30 days of release from sentencing or release from custody, whichever is later, the defendant shall contact the U.S. Marshals Forfeiture Unit to set up automatic reoccurring payments on Pay.gov. Nothing in this agreement prevents the Government or the U.S. Marshals Service, or any other federal law enforcement agency, from seizing substitute assets to satisfy the forfeiture money judgment. Satisfaction of the forfeiture money judgment shall not be included as a condition of the defendant's supervised release.

The defendant agrees to waive all interests in each of the above assets in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for each of the above assets and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise him of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time his guilty plea is accepted.

The defendant agrees to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or forfeiture of the above assets. The defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant also understands and agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

<u>Credit Report</u>

The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guidelines determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guidelines application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) disclosing to the United States Attorney's Office and the United States Probation Office a complete and truthful financial statement detailing the defendant's financial condition. The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Guidelines Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

Count One

Pursuant to U.S.S.G. § 2E1.2(a)(2), the defendant's base offense level is the offense level applicable to the underlying unlawful activity in respect to which travel was undertaken, which is 14 under U.S.S.G. § 2G1.1(a)(2). Four levels are added under U.S.S.G. 3B1.1(a) because the defendant was an organizer/leader of a criminal activity that involved five or more participants or was otherwise extensive. Therefore, the total offense level is 18.

Count Three

The parties agree that the defendant's base offense level under U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(I) is 18 to reflect a tax loss of $550,000. Two levels are added pursuant to U.S.S.G. § 2T1.1(b)(1) because the defendant failed to report the source of income exceeding $10,000 in any year from criminal activity. Four levels are added under U.S.S.G. 3B1.1(a) because the defendant was an organizer/leader of a criminal activity that involved five or more participants or was otherwise extensive. The total offense level is 24.

Count Nine

The defendant's base offense level under U.S.S.G. § 2S1.1(a)(1) is calculated under U.S.S.G. § 2G1.1(a)(2), resulting in a base offense level of 14. Two levels are added pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because Count Nine charges a violation of Title 18, United States Code, Section 1956. The total offense level is 16.

Count Ten

The defendant's base offense level under U.S.S.G. § 2S1.1(a)(1) is calculated under U.S.S.G. § 2G1.1(a)(2), resulting in a base offense level of 14. One level is added pursuant to U.S.S.G. § 2S1.1(b)(2)(A) because Count Ten charges a violation of Title 18, United States Code, Section 1957. The total offense level is 15.

Count Twelve

The defendant's base offense level under U.S.S.G. § 2S1.1(a)(1) is calculated under U.S.S.G. § 2B1.1, resulting in a base offense level of 15. One level is added pursuant to U.S.S.G. § 2S1.1(b)(2)(A) because Count Twelve charges a violation of Title 18, United States Code, Section 1957. The total offense level is 16.

Grouping

Applying grouping analysis under § 3D1.2(b), the offense levels for the crimes of conviction in Counts One, Three, Nine, Ten, and Twelve are grouped, and thus the higher offense level (24) is used. § 3D1.3(a). Accordingly, the total offense level is 24.

Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 21.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate. The government reserves its right to argue that any such re-calculation is not a basis for any downward departure or variance and its right to oppose any request from the defendant for such a departure or variance.

A total offense level of 21, assuming placement in Criminal History Category I, would result in a Guidelines range of 37 to 46 months of imprisonment (sentencing table) and a fine range of $15,000 to $150,000 (U.S.S.G. § 5E1.2(c)(3)). The defendant also is subject to a supervised release term of up to ~~five~~ three years. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a variance, and both sides reserve their right to object to a, variance or a non-Guidelines sentence. Moreover, the defendant reserves the right to argue that a fine is not appropriate in this case, and the Government reserves the right to argue that a fine is appropriate in this case.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

Information to the Court

The parties reserve their rights to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

**WAIVER OF RIGHTS**

The defendant acknowledges and agrees that he is knowingly, intelligently, and voluntarily waiving the following rights:

Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

Discovery

The defendant acknowledges that the Government may not have yet produced any or all discovery material, including but not limited to discovery under the Jencks Act, 18 U.S.C. § 3500, the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or the Local Rules of Criminal Procedure, Standing Order on Discovery. The attorneys for the Government are not aware of any information that, in their view, would establish the defendant's factual innocence of the crimes to which the defendant is pleading guilty. However, the attorneys for the Government do not warrant that they have reviewed all material in their possession, or that their assessment of the exculpatory nature of information known to them would be the same as that of the defendant or his counsel. Nonetheless, the defendant acknowledges that (1) he has accepted this plea agreement and decided to plead guilty because he is in fact guilty and seeks no further discovery or disclosures of information, and (2) in reaching that decision, he has not relied upon any representations concerning the Government attorneys' assessment of information. On that basis, the defendant waives any and all right to withdraw his plea or attack his conviction, either on direct appeal or collateral attack, on the ground that the Government has not produced any discovery material beyond what already has been produced as of the date of this plea agreement. The Government nevertheless will produce, in advance of sentencing, additional material specifically requested by the defendant in connection with any sentencing issue, to the extent that the requested material is in the Government's possession.

Waiver of Statute of Limitations

The defendant agrees that, should the conviction following the defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

Waiver of Right to Challenge Conviction

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction. By pleading guilty, the defendant waives his right to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. In addition to any other claims the defendant might raise, the defendant waives the right to challenge the conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

Waiver of Right to Appeal or Collaterally Attack Sentence

The defendant acknowledges that under certain circumstances, the defendant is entitled to challenge his sentence. In consideration for the benefits offered under this agreement, the defendant agrees not to appeal or collaterally attack the sentence in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241, if that sentence does not exceed 46 months of imprisonment, ~~five~~ three years of supervised release, a ~~$600~~ 500 special assessment, restitution in the amount of $700,000, and the forfeiture provisions described in the agreement, even if the Court imposes such a sentence based on an analysis different from that specified above. Similarly, the defendant will not challenge any condition of supervised release imposed by the Court for which he had notice and an opportunity to object. Moreover, the Government will not appeal a sentence imposed within or above the stipulated sentencing range. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

**ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA**

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because the defendant is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and the defendant (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which the defendant is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement. The defendant voluntarily, knowingly, and intelligently waives any rights the defendant may have to seek attorney's fees and other litigation expenses under the Hyde Amendment.

**SCOPE OF THE AGREEMENT**

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

**COLLATERAL CONSEQUENCES**

The defendant understands that he will be adjudicated guilty of each offense to which the defendant has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and, in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which the defendant is licensed, or with which the defendant does business, as well as any current or future employer of the fact of his conviction.

**SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH**

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of the defendant's participation in the criminal offenses arising from his ownership and operation of the Electric Blue, an adult entertainment venue in Tolland, Connecticut, which forms the basis of the indictment in this case. After sentencing, the Government will move to dismiss counts Two and Four-Eight of the indictment because the conduct underlying the dismissed counts will have been taken into account in determining the appropriate sentence. This provision does not apply to any conduct unknown to the Government at the time of the signing of this agreement.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw the guilty plea.

**NO OTHER PROMISES**

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

[signature]
ROBERT S. DEARINGTON
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

[signature] May 19 / 2026
KENNETH DENNING Date
The Defendant

I have thoroughly read, reviewed, and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

[signature] May 19, 2026
MARTIN MINNELLA, ESQ. Date
Attorney for the Defendant

## STIPULATION OF OFFENSE CONDUCT AND RELEVANT CONDUCT

The defendant and the Government stipulate to the following offense conduct and relevant conduct that give rise to the defendant's agreement to plead guilty to the indictment:

### Travel Act Conspiracy

1. Defendant KENNETH DENNING ("DENNING") has been the owner of the Electric Blue Café ("the Electric Blue"), a strip club located in Tolland, Connecticut as early as the 1990s through its sale in or about January 2025. The Electric Blue was owned by Denning Enterprises, a holding company nominally owned by DENNING's wife (divorced in or about July 2025), but controlled by DENNING.

2. Beginning in or around January 2020 and continuing through at least March 2023, DENNING and employees of the Electric Blue knowingly agreed to a scheme to use facilities in interstate commerce, including but not limited to automatic teller machines ("ATMs"), the processing of credit card payments, and social media accounts operated on behalf of the Electric Blue, to promote and facilitate prostitution at the Electric Blue. DENNING was the organizer/leader of the scheme that involved five or more of his employees at the Electric Blue.

3. DENNING and employees of the Electric Blue knowingly participated in the scheme and, after using various interstate facilities to facilitate and promote prostitution at the Electric Blue, committed numerous overt acts in furtherance of the goals of the scheme, as further described below.

4. DENNING and employees of the Electric Blue attracted customers to the Electric Blue by advertising and featuring women dancing nude and semi-nude on stages and in private and semi-private rooms.

5. DENNING and his employees typically, but not always, required each dancer to pay a "house fee" to perform. The amount for house fees varied but could be as much as $50 per dancer per shift. This payment was almost always paid in cash and was collected by DENNING and his coconspirators.

6. Customers were often required to pay a cover charge, typically $5 but sometimes more, at the door to enter the Electric Blue. The cover charge was always paid in cash.

7. Dancers were encouraged by DENNING and employees of the Electric Blue to solicit customers to engage in commercial sex transactions in the private and semi-private rooms.

8. The Electric Blue had multiple small, private rooms inside called "VIP rooms" or "Champagne rooms." To enter one of the "VIP rooms" with a dancer, a customer had to pay a fee, typically $100-$150, to an employee of the club, usually but not always paid in cash, and then would negotiate an additional fee with the dancer directly for

their time in the VIP room. These additional fees often included payments for commercial sex acts performed by the dancers in the "VIP rooms." DENNING and his employees knew that dancers regularly performed commercial sex acts in the "VIP rooms" or "Champagne rooms" at the Electric Blue.

9. The Electric Blue also had a "lap dance room," which was a room with semi-private stalls where dancers and customers could go for private dances. To enter the lap dance room, a customer had to pay a cash fee, typically $20, to an employee of the club, and then negotiate a fee for the private dance directly with the dancer. These additional fees often included payments for commercial sex acts performed by the dancers in the "lap dance room." DENNING and his employees knew that dancers regularly performed commercial sex acts in the "lap dance room."

10. DENNING and his employees ordered, placed, and operated ATMs in the Electric Blue. DENNING profited from the use of the ATMs by customers of the Electric Blue. Many customers at the Electric Blue obtained some or all of the cash used to pay for entrance fees to the semi-private and private rooms and for commercial sex acts from dancers from ATMs on the premises. DENNING and his employees knew and intended that customers would regularly use cash from the ATMs to pay for commercial sex acts.

11. The $20 fee to enter the lap dance room and the $100-$150 fee to enter the private rooms, typically paid in cash, went to "the house," meaning these funds went to the DENNING and other employees of the Electric Blue. The dancers negotiated the fees paid for the lap dances or private shows and retained those fees, which were almost always paid in cash. In other words, the dancers performed sexual acts on their customers in return for the customers having paid "the house" a fee, typically either $20 or $100-$150 depending on the level of privacy desired, along with paying the dancer a separate fee, sometimes hundreds of dollars or more, often with cash from the ATMs.

12. DENNING and his employees sent text messages in interstate commerce to communicate with dancers, customers, and other individuals about commercial sex acts and about club business.

<u>Tax and Money Laundering Conspiracies</u>

13. DENNING created a scheme to separate income earned at the Electric Blue through legitimate means, often derived from a customer paying for food or beverages with a credit or debit card, from income earned through illegal means such as prostitution, typically paid for in cash. For tax years 2020, 2021, and 2022, DENNING and his employees knowingly agreed to and participated in this scheme to impede, impair, obstruct and defeat the lawful functions of the IRS. DENNING was the organizer/leader of the scheme that involved five or more of his employees at the Electric Blue. DENNING and his employees committed numerous overt acts in furtherance of the scheme.

14. Each time a customer used a credit or debit card for a purchase at the Electric Blue, typically alcohol, that income would go into the corporate bank account. DENNING and his employees referred to this money as "bar money" or "club money."

15. DENNING and his employees collected the cash taken in by the club, often through the payment by a customer of a "house fee" to enter a semi-private or private room with a dancer, a cover charge paid at the door, or a fee paid by dancers in order to dance at the club. This cash was collected, put in envelopes noting the source of the cash, and then put in a safe in the office of the Electric Blue that only DENNING could access. They referred to this money as "Kenny's money." They used this money to make cash payments associated with the daily operation of the business, including paying the mortgage on the property and paying employees of the club, in part to prevent the IRS from calculating the correct amount of gross receipts for the business. After paying business expenses, the remaining amounts of "Kenny's money" was income to DENNING that he used in various ways, including personal expenses and gambling large sums of money at casinos in Connecticut and elsewhere.

16. DENNING employed codefendant Joshua Baker ("Baker") at the Electric Blue as a bookkeeper for the club. As part of his employment, Baker compiled a monthly spreadsheet showing, among other things, the Electric Blue's purported income. At DENNING's direction, Baker included on this spreadsheet "club money," such as income generated from food and alcohol sales and other sources of income from the club, but purposefully omitted "Kenny's money," such as cash generated from private dances and commercial sex acts by dancers at the club. Baker or another Electric Blue employee would send the spreadsheets to the Electric Blue's tax return preparer, who would report to the relevant authorities and prepare taxes on only the reported income. The income generated from the commission of commercial sex acts was not reported to the club's tax return preparer.

17. On March 16, 2023, investigators executed a search warrant at the Electric Blue and found approximately $45,421 in cash inside a safe in DENNING's office. The documentation found with the cash indicated that approximately $39,751 of the cash represented "Kenny's money" collected between March 2, 2023 and March 15, 2023. Based upon an extrapolation analysis of this two-week time period (taking into consideration the Electric Blue's legitimate revenue during the time of the conspiracy), investigators calculated that DENNING and his employees caused as much as approximately $2,988,797.57 in material taxable business receipts not to be reported to the IRS, causing a total income tax underpayment of approximately $1,075,830 on his personal tax returns.

18. Based upon the numerous variables that can impact the final calculation under the extrapolation analysis, the parties agree that DENNING caused a total income tax underpayment of approximately $550,000 on his personal tax returns. The defendant agrees that his underpayment was $109,737 for the Tax Year 2020, $222,006 for Tax

Year 2021, and $218,256 for Tax Year 2022. The parties agree to the following for tax years 2020 through 2022:

| | 2020 | 2021 | 2022 |
|---|---|---|---|
| Other Income - Unreported Cash Embezzled | $ 313,145 | $ 622,399 | $ 590,298 |
| Unreported Wage Income | | $ 156,000 | |
| | | | |
| Total Tax Loss | $ 109,737 | $ 222,006 | $ 218,256 |

19. On or about February 6, 2020, Baker took at least $600 in cash from the club generated in whole or in part by commercial sex acts at DENNING's behest and used that cash to pay the club's phone/internet bill with Comcast, which constituted a financial transaction that affected interstate commerce. DENNING and Baker knew that the $600 represented the proceeds from the scheme using facilities in interstate commerce to promote and facilitate prostitution at the Electric Blue. Furthermore, DENNING and Baker knew that the money was used to promote the carrying on of the scheme and was designed to conceal the nature, the location, the source, or the control of the proceeds of the scheme. The $600 was not reported to the club's accountant and no taxes were paid on that income.

20. On or about January 21, 2021, Baker took $3,900 in cash from the club generated in whole or in part by commercial sex acts at DENNING's behest and used that cash to purchase a cashier's check at People's United Bank for $4,000, which he then used to pay the mortgage for the Electric Blue, which constituted a financial transaction that affected interstate commerce. DENNING and Baker knew that the $3,900 represented the proceeds from the scheme using facilities in interstate commerce to promote and facilitate prostitution at the Electric Blue. Furthermore, DENNING and Baker knew that the money was used to promote the carrying on of the scheme and was designed to conceal the nature, the location, the source, or the control of the proceeds of the scheme. The $3,900 in income was not reported to the club's accountant and no taxes were paid on that income.

<u>Monetary Transaction in Property Derived from Unlawful Activity</u>

21. DENNING regularly used unreported cash receipts from the Electric Blue to pay personal expenses and gamble large sums of money at casinos. For example, on February 23, 2023, DENNING deposited approximately $21,700 in cash at the Mohegan Sun Casino in Uncasville, Connecticut, for purposes of gambling. DENNING knew that the cash was derived in whole or in part from the proceeds from the scheme using facilities in interstate commerce to promote and facilitate prostitution at the Electric Blue.

EIDL Program

22. The Economic Injury Disaster Loan ("EIDL") program was a United States Small Business Administration program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

23. In order to obtain an EIDL loan and/or advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, including certifying that the "Applicant does not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature."

24. On or about July 8, 2020, DENNING knowingly devised a scheme to defraud the SBA by submitting an application (in connection with SBA Loan # 3972108103) to the SBA for an EIDL for "Denning Enterprises llc" with the trade name "Electric Blue," seeking a loan amount of $150,000, which contained material misrepresentations, including: (1) that the business did "not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature," when in fact it was operating as a strip club and brothel where performances of a prurient sexual nature were performed regularly, and (2) describing the "Business Activity" as "Eating & Drinking Places" when in fact it was primarily a strip club and brothel.

25. DENNING electronically signed and submitted A Loan Authorization and Agreement in connection with SBA Loan # 3972108103 for a loan under the EIDL program for the Electric Blue, causing the SBA to deposit through interstate wires $149,900 to the Electric Blue's business bank account on or about July 23, 2020.

Monetary Transaction in Property Derived from Unlawful Activity

26. On or about July 23, 2020, DENNING knowingly transferred approximately $20,000 in EIDL funds that he knew involved the proceeds of wire fraud occasioned by a check from the Electric Blue's business bank to his personal bank account. This transaction took place within the United States.

This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

KENNETH DENNING
The Defendant

ROBERT S. DEARINGTON
ASSISTANT UNITED STATES ATTORNEY

MARTIN MINNELLA, ESQ.
Attorney for the Defendant

**RIDER CONCERNING RESTITUTION**

The Court shall order that the defendant make restitution under 18 U.S.C. §§ 3663 and 3663A as follows:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

   The greater of -
   (I) the value of the property on the date of the damage, loss, or destruction; or

   (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

   A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. Reimburse the victim for income lost by such victim as a result of such offense.

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services.

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the Court-ordered restitution, the Court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, 18 U.S.C. § 3565, or a modification of the conditions of supervised release, 18 U.S.C. § 3583(e). Failure to pay restitution also may result in the defendant being held in contempt, or the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3613A, 3614. Moreover, in the event of default, notwithstanding any installment schedule for the payment of restitution, the Court may order payment of the entire amount of restitution due within 30 days after notification of the default,

subject to the provisions of 18 U.S.C. §§ 3572(i) and 3613A. The Court also may order that the defendant give notice to any victim(s) of the offense under 18 U.S.C. § 3555.